MISSOURI PACIFIC RAILROAD
COMPANY, d/b/a Union Pacific
Railroad Company

v.

Salvador BUENROSTRO.

No. 04–92–00033–CV.

Court of Appeals of Texas,
San Antonio.

Feb. 26, 1993.
Rehearing Denied May 4, 1993.

Neil E. Norquest, Law Office of Neil E. Norquest, McAllen, Mitchell C. Chaney, Jaime A. Saenz, Rodriguez, Colvin & Chaney, Brownsville, Luther H. Soules, III, Soules & Wallace, San Antonio, James P. Wallace, Soules & Wallace, Austin, for appellant.

Homer Mora, Jack B. Peacock, Jr., Falfurrias, William J. Tinning, Law Office of William J. Tinning, Corpus Christi, Eugenio

A. Soliz, Jr., Falfurrias, Timothy Patton, Pozza & Patton, San Antonio, for appellee.

Before REEVES, C.J., and BUTTS and BISSETT[1], JJ.

## OPINION

BISSETT, Justice (Assigned).

This is an appeal by Missouri Pacific Railroad Company, d/b/a/ Union Pacific Railroad Company ("MoPac"), defendant in the trial court, from a judgment in favor of Salvador Buenrostro ("plaintiff") for personal injuries suffered when plaintiff was attempting to lift a railroad crosstie.

Plaintiff sued MoPac for negligence under the Federal Employers' Liability Act ("FELA")[2] and for having maintained and/or failed to warn of an alleged dangerous premises condition. Trial was to a jury, and based on the jury's verdict judgment was rendered and filed against Mo-Pac on September 30, 1991, for $458,000.00 in actual damages plus prejudgment interest. MoPac's motions for judgment notwithstanding the verdict and for new trial were denied.

On February 13, 1985, "MoPac" entered into a "Fibre Optics" Agreement with U.S. Sprint ("Sprint") to "permit" Sprint the use of a portion of its railroad right-of-way for the purpose of laying a fibre optic cable. The right-of-way was fifteen feet wide and the boundary nearest the railroad was twenty feet from the centerline of the railroad track. Although legally required to permit Sprint the use of its right-of-way, MoPac was also legally required, as a certificated common carrier, to maintain its own transportation system along its right-of-way. In keeping with this obligation, Mo-Pac secured from Sprint an agreement that Sprint's right of use would be subject to MoPac's right and obligation to use and maintain its entire property in the performance of its public duty as a common carrier.

In order to coordinate these two legally mandated uses of its right-of-way, MoPac further required Sprint to coordinate with MoPac's general manager, or his designee, for each access to the right-of-way with the understanding that MoPac's operations would have priority over Sprint's installation and construction activities, and with the concomitant necessary understanding that Sprint would schedule installation and construction to avoid disruption to railroad operations.

Aside from MoPac's legal obligation to keep its own rail transportation system functioning, however, it was to have no control over the laying or maintenance of the cable. Instead, Sprint was to be and remain an independent contractor for the purposes of laying and maintenance of the cable, and Sprint was to furnish all of the equipment necessary to construct and maintain the system.

MoPac, on the other hand, was to have control over the services rendered by U.S. Sprint's employees and no control over the employment, discharge or compensation of Sprint's contractors and subcontractors, and was, specifically, not to be responsible for the clearing or removal of trees, shrubs, plants or debris from Sprint's area of occupancy.

Having secured its agreement with Mo-Pac, Sprint contracted with Grady Crawford Construction Company ("Crawford"), an expert in the field of laying fibre optics cable, to do the actual job of laying the cable. Crawford in turn subcontracted with Joe Brewer Construction Company ("Brewer") to clear that portion of the right-of-way leased to Sprint for the laying of the cable. Brewer, a brush-clearing concern, thereafter hired plaintiff and others to assist in its clearing function.

MoPac designated its own employee, Steven Waits, to monitor the activities of Sprint (and its contractors) in laying the fibre optics line to assure that such did not jeopardize MoPac's activities or injure the property of other right-of-way users. To

**1.** Assigned to this case by the Chief Justice of the Supreme Court of Texas, pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1988).

**2.** 45 U.S.C. §§ 51–60.

that end, Waits had authority to stop the fibre optics work, but only in the event that it was to interfere with the structure of MoPac's track or the movement of its trains, or with the cables of other right-of-way users.[3] To that end, Waits also had the authority to keep the fibre optics workers from contact with MoPac's trains, by posting flagmen with such crews which might be working within twenty feet of the railroad track. Waits did not, however, have authority to evict any company for safety violations, to tell Sprint or its subcontractors what machinery or equipment to use, or to tell Sprint or its subcontractors how clear the debris from the right-of-way or how to go about the details of the work. In addition, MoPac was not responsible for the maintenance and/or clearing of Sprint's area of occupancy, nor did it have any control over the employees of Sprint or its contractors or subcontractors. During the fall of 1987, plaintiff felt a sharp pain in his back and stomach,[4] while removing railroad ties from the right-of-way as a part of Brewer's cleaning operation.[5]

Plaintiff testified at trial that he and other members of the Brewer cleanup crew had been picking up railroad ties all day on the date of the accident. He further testified that he and another man were removing a railroad crosstie from Sprint's designated area of occupancy when he felt a sharp pain to his back and stomach.

Plaintiff filed his Original Petition on August 30, 1990, and his Second Amended Original Petition on his trial pleading, July 28, 1991, wherein he alleged in particular:

[t]hat on or about September 30, 1987, Plaintiffs while performing operations

with his employer so as to actually or constructively make Plaintiff an employee of Defendant for F.E.L.A. purposes, was working with a crew of Defendant, and in summary, further alleged that, at the time of his injury, he was engaged in interstate commerce activities on behalf of MoPac; that MoPac had caused his injury by failing to provide him with safe equipment and a safe place to work; that MoPac had been negligent in failing to correct and/or maintain a dangerous condition on the premises; and that he was a borrowed, dual or sub-server of MoPac at the time of his injury.[6]

Plaintiff thus went to trial upon two theories of recovery: 1) that MoPac was his "employer" within the meaning of § 51 of the FELA and had violated FELA-mandated duties to provide him with safe equipment and a safe place to work; and 2) that MoPac had violated a duty of care as a premises occupier to maintain the premises free of an unsafe condition and/or to warn him of same.

The jury found in their answer to Special Issue No. 1 that at the time of the accident in question, plaintiff was an employee of MoPac, who served as a borrowed servant of MoPac, or was acting for both Brewer or MoPac simultaneously, or was a subservant "of a company that is in turn a servant of the railroad."

Special Issue No. 2 asked: "Whose negligence, if any, was the legal cause, in whole or in part however slight, of the occurrence in question?" ... "Answer "yes" or "no" beside the names listed below"

(a) Defendant Missouri Pacific Railroad Company d/b/a/ Union Pacific Railroad Company ____

---

3. In the words of plaintiff's own expert, MoPac's concerns under its fibre optics agreement were to see to it that fibre optics personnel were "kept away from oncoming train movements" and did not "cut ... other telecommunication companies' lines which apparently occurred on a couple of occasions."

4. The pain was later diagnosed as a hernia and lower back injury.

5. Although plaintiff could not recall at the time of trial exactly when his injury occurred, he did remember that it occurred between September

and December of 1987. A worker's compensation insurance claim form filed by him stated that he was injured on December 8, 1987, while removing an old wooden track tie from the right-of-way.

6. Plaintiff did not allege the specific date of his injury in any of his petitions. However, MoPac did not except to that omission and the evidence shows that plaintiff suffered an injury to his back on November 29, 1989 and to his abdomen on December 8, 1987.

(b) Plaintiff, Salvador Buenrostro ____

The jury answered "yes" to (a) and "no" to (b).

The jury was then instructed:

If you have answered "Yes" to both blanks of the preceding question, and only them, you will answer the next question (Special Issue No. 3).

Consequently, Special Issue No. 3 was not answered.

The jury found, in answer to Special Issue No. 4, that the negligence of MoPac "proximately caused the occurrence or injury in question."

The jury found, in answer to Special Issue No. 5, that MoPac was 100% negligent as found by it in answer to Special Issue No. 4.

The remaining Special Issues are damage issues, which are not challenged by MoPac.

MoPac contends in its ninth point of error that the trial court erred in refusing to permit it to amend its pleadings to assert the defense of limitations.

MoPac did not initially plead limitations, but on September 16, 1991, it sought leave, pursuant to Rules 63 and 66, Tex.R.Civ.P., to file an amended pleading asserting its limitations defense. The trial court, however, denied such Motion, and thereby precluded MoPac from affirmatively pleading limitations.

MoPac argues that in denying it leave to amend, the trial court clearly abused its discretion; that raising the defense of limitations would not have delayed the trial, would not have surprised or prejudiced plaintiff, whose own pleadings demonstrated the bar; and would not have raised new fact issues; therefore, under such circumstances, the trial court abused its discretion by not permitting late pleadings asserting such defense. MoPac further argues that plaintiff could not truthfully suggest that he was in any manner surprised by the assertion of a defense which appeared on the face of its pleadings;[7] nor could he

truthfully assert that there were any fact issues which he would therefore be rendered "unprepared" to meet. Accordingly, under the circumstances of this case, both the spirit and intent of Rule 66 require that the amendment be permitted, since the limitations defense was established as a matter of law.

Plaintiff, on the other hand, contends that the trial court did not abuse its discretion in denying MoPac leave to file a trial amendment setting up the defense of limitations because: 1) a docket control order set May 13, 1991, as the deadline for the filing of pleading by plaintiff and May 20, 1991, as the deadline for the filing of pleadings by MoPac, and the motion for leave to file an amended answer, or in the alternative a trial amendment, setting up the defense of limitations was not presented to the trial court until September 16, 1991, which was after the voir dire of the jury panel had been completed and the jury had been selected; 2) permitting MoPac to inject limitations into the case of the time the request for leave to file was made would have denied plaintiff his right to develop proof on responsive allegations on the discovery rule and fraudulent concealment as well as to deny him his right to voir dire the jury on those issues; 3) it would have prejudiced the plaintiff to have allowed such amendment since not only would the cause of action have obviously been negated, but at the very least, would have required plaintiff to develop facts showing the reasonableness of his late discovery of MoPac's use of sub-contractors to pull out the railroad ties and its FELA liability; and 4) an amended answer, or a trial amendment, injecting limitations into the case would have presented a new defense which would have prejudiced plaintiff.

■ We agree with plaintiff. The trial court has the discretion to refuse a trial amendment when the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing

7. Plaintiff's Original Petition, filed on August 13, 1990, alleged in substance, that his injury occurred on or about September 30, 1987, a date manifestly more than two years prior to the filing of the Petition. Plaintiff did not allege any fact or circumstance which might operate to toll the applicable two-year limitation period.

party objects to the amendment. *Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990). "Where it appears that the new matter was known to the parties seeking to file the amendment, or by reasonable diligence, it could have been known at such a time as would have enabled them to include it in their former plea, the request should be denied." *Amsav Group, Inc. v. American Sav. & Loan Ass'n of Brazoria County*, 796 S.W.2d 482, 490 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

■ Plaintiff, in the instant case, objected to the filing of MoPac's trial amendment. The suggested trial amendment, if permitted to be filed, would have injected a new defense in the case which would have prejudiced plaintiff. Moreover, MoPac knew from August 31, 1990, the plaintiff alleged that he was injured on September 30, 1987. The trial court did not abuse its discretion in refusing to permit the filing of MoPac's trial amendment. MoPac's ninth point of error is overruled.

MoPac contends in its second point of error that there is no evidence to support the jury's finding in response to Special Issue No. 1 that plaintiff was a borrowed servant of MoPac at the time of his injury, or that he could be deemed to be acting for both Brewer or MoPac simultaneously, or that he was sub-servant of Brewer that was in turn a servant of MoPac. We agree.

■ In reviewing "no evidence" points, the court of appeals will consider only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary and will affirm the judgment if there is any evidence of probative value to support the verdict in a jury tried case. *International Bank, N.A. v. Morales*, 736 S.W.2d 622, 624 (Tex.1987); *King v. Bauer*, 688 S.W.2d 845, 846 (Tex. 1985); *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286 (1951). The standard to be applied to "no evidence" is whether such evidence, either direct or circumstantial, amounts to more than a mere scintilla. If

there is more than a scintilla of evidence to support the finding, the challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). Applying these principles, we must first determine if there is evidence of probative value to support the trial court's judgment. If a no evidence point is sustained and the proper procedural steps have been taken, the finding under attack may be disregarded entirely and judgment rendered for appellant. *United States Fire Ins. Co. v. Carter*, 473 S.W.2d 2, 3 (Tex.1971); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

■ It is undisputed that Brewer was plaintiff's general employer. To establish a case of liability against a railroad under the FELA, a claimant must demonstrate, first, that he was an "employee" of the railroad under applicable common-law principles. The United States Supreme Court has laid down the following rule in *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974):

> Under common-law principles, there are basically three methods by which a plaintiff can establish his "employment" with a rail carrier for FELA purposes even while he is nominally employed by another. First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. *See* Restatement (Second) of Agency § 227; *Linstead v. Chesapeake & Ohio R. Co.*, 276 U.S. 28 [48 S.Ct. 241, 72 L.Ed. 453] (1928). Second, he could be deemed to be acting for two masters simultaneously. *See* Restatement § 226; *Williams v. Pennsylvania R. Co.*, 313 F.2d 203, 209 (CA2 1963). Finally, he could be a subservant of a company that was in turn a servant of the railroad. *See* Restatement § 5(2); *Schroeder v. Pennsylvania R. Co.*, 397 F.2d 452 (CA7 1968).

*See also Zarate v. Brownsville Nav. Dist.*, 768 S.W.2d 393, 396 (Tex.App.—Corpus Christi 1989, no writ).

Second, the claimant must also prove that he was engaged in the furtherance of

the railroad's interstate commerce activities at the time of his injury. *Lowery v. Illinois Cent. Gulf R.R.*, 891 F.2d 1187, 1190–91 (5th Cir.1990); *Fowler v. Seaboard Coastline R.R.*, 638 F.2d 17, 19 (5th Cir. 1981); *Felton v. Southeastern Pennsylvania Transp. Authority*, 757 F.Supp. 623, 627 (E.D.Pa.1991); 45 U.S.C. § 51.

The Fifth Circuit has put the relevant inquiry as follows:

> ... [U]nder the FELA a worker can be the "employee" of the railroad even though carried on the employment rolls of another company and paid by that other company. The test of employment ... is whether the railroad has control of the employer or the right to control the employee. The law does not require that the railroad have full supervisory control. It requires only that the railroad, through its employees, plays a "significant supervisory role" as to the work of the injured employees.

*Lindsey v. Louisville & Nashville R.R.*, 775 F.2d 1322, 1324 (5th Cir.1985).

■ As has been noted, in the instant case the Fibre Optics Agreement between MoPac and Sprint expressly provided that MoPac would have no control over the employment, discharge, compensation of or services rendered by Sprint's employees, contractors and subcontractors; that Sprint should be and remain an independent contractor; and that MoPac would not be responsible for the clearing or removal of trees, shrubs, plants or debris from that portion of its right-of-way leased to Sprint.

It is established law that contractual provisions such as these are conclusive upon the issue of right of control, obviating the necessity of any further factual consideration of the right to control the details of plaintiff's work. *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d 327, 331 (Tex.1968), *overruled as to narrow holding of no damages for loss of child, Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex.1983); *Producers Chemical Co. v. McKay*, 366

S.W.2d 220, 226 (Tex.1963); *Bucyrus–Erie Co. v. Fogle Equipment Corp.*, 712 S.W.2d 202, 204 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The critical consideration is which employer had the "right to control the manner and details of the employee's work." *Dodd v. Twin City Fire Ins. Co.*, 545 S.W.2d 766, 768 (Tex.1977). The court in *Sanchez v. Leggett*, 463 S.W.2d 517 (Tex.Civ.App.—Corpus Christi (1971), *writ ref'd n.r.e.)*, 468 S.W.2d 63 (Tex.1971) stated:

> It is clear Texas law that where there is a contract between the general and special employer which resolves the question of the employment status, then the factual consideration of the right to control the details of the work is unnecessary. *Producers Chemical Co. v. McKay*, 366 S.W.2d 220 (Tex.1963); *Magnolia Petroleum Company v. Francis*, 169 S.W.2d 286 (Tex.Civ.App.—Beaumont 1943, err. ref.).

*Sanchez*, 463 S.W.2d at 520.

Absent such a contract, the courts review the facts to determine whether the general employer or the special employer had the right to control the employee's activities. *McKay*, 366 S.W.2d at 225–26; *Archem Co. v. Austin Indust., Inc.*, 804 S.W.2d 268, 270 (Tex.App.—Houston [1st Dist.] 1991, no writ); *Sanchez v. Leggett*, 489 S.W.2d 383, 387 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n.r.e.).

A case that is similar with respect to whether the employee in question in a borrowed servant is *Magnolia Petroleum Co. v. Francis*, 169 S.W.2d 286 (Tex.Civ.App.—Beaumont 1943, writ ref'd), where the contract expressly provided that the contractor would "perform the work and services hereinafter set out as an independent contractor," and that the contractor would provide such service "free of control or supervision." *Id.* at 286–87. Such language is strikingly similar to the language in the Fibre Optics Agreement in the instant case as shown by the following comparison.

| Magnolia Agreement | Fibre Optic Agreement |
|---|---|
| "Contractor hereby agrees to … perform the work and services hereinafter set out **as an independent contractor.**" Magnolia at p. 286. | "It is the intention of the parties that [Sprint] shall be and remain **an independent contractor.**" (Px. 1, p. 21). |
| "Contractor hereby agrees to perform the work and services hereinafter set out … **free of control or supervision of the company** …" Magnolia at p. 286. | "Railroad **reserves no control** over … services rendered by [Sprint's] employees … (Px. 1, p. 21). |
| "… all persons engaged in the performance of said work or service **shall be solely the servants or employees of Contractor** … Magnolia at p. 286. | "Railroad reserves no control over the **employment, discharge, [or] compensation of** … [Sprint's] contractors and subcontractors. (Px. 1, p. 21). |

Of further significance is the fact that the kinds of control which MoPac did contractually retain were not the kinds which would give rise to an employment relationship. Thus, an owner's rights to, *inter alia*, enter the property; inspect the work; take possession or use of any completed or partially completed part of the work; specify the kinds and amount of insurance which its contractors should carry; require that the work be inspected and approved by the owner's own supervisor; or even specify the details of the project, do not constitute the kinds of control which give rise to an employment relationship under the FELA. *Zarate v. Brownsville Nav. Dist.*, 768 S.W.2d at 398; *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 378–79 (5th Cir.1985). Because the Fibre Optics Agreement was dispositive of the control issue, the question of whether MoPac exercised the necessary degree of control over the plaintiff's activities was not relevant to plaintiff's alleged employment status as a borrowed servant, a dual servant or a subservant, as found by the jury. It is conclusively established by the Fibre Optics Agreement that MoPac did not retain the degree of control over the activities of

Sprint or its subcontractors which was necessary to establish an employment relationship between it and plaintiff.

Even where the courts have been called upon to determine the right of control issue in the absence of dispositive contract provisions such as those at bar, they have been careful to distinguish between the kind of control which is merely exercised "in the interests of cooperation and safety" and the "authoritative direction and control" which is necessary to establish an employment relationship. The Supreme Court of Texas noted in *J.A. Robinson Sons, Inc. v. Wigart*, 431 S.W.2d at 331:

As we said in the *Producers Chemical* case, 'we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or necessary cooperation, where the work furnished is part of a larger undertaking.' 366 S.W.2d at 226.

This distinction is recognized by the United States Supreme Court to be equally applicable in FELA cases. *See Kelley*, 419 U.S. at 318, 95 S.Ct. at 472. There the plaintiff was seriously injured when he fell from atop a tri-level railroad car where he

had been working. Although Kelley acknowledged that he was the general employee of a trucking company rather than the railroad, he contended that his work was sufficiently under the control of the railroad to bring him within the coverage of the FELA. As in the instant case, the crew of which Kelley was a member worked most of the time on the railroad's premises, and the activities of Kelley's general employer and those of the railroad were both conducted on the railroad's premises and "were closely related and necessarily had to be coordinated." *Id.* at 327, 95 S.Ct. at 477. To an even greater extent than in the instant case, in *Kelley*, the railroad employees and the contractor's employees "had substantial contact with one another." *Id.* And in *Kelley*, unlike in the instant case, "railroad employees were *responsible* for checking safety conditions" at the plaintiff's workplace. *Id.* at 327, 95 S.Ct. at 477. (emphasis added)

In keeping with its obligation to distinguish between "authoritative direction and control" and those activities which merely constitute "necessary cooperation . . . where the work furnished is part of a larger undertaking," the United States Supreme Court held that the above-related activities and responsibilities of the railroad did not constitute the kind of control necessary to make Kelley the railroad's borrowed, dual or sub-servant. *Id.* at 329, 95 S.Ct. at 478; *quoting Standard Oil Co. v. Anderson*, 212 U.S. 215, 222, 29 S.Ct. 252, 254, 53 L.Ed. 480 (1909). Specifically, the Court found that, "despite such activities and responsibilities, the railroad's employees had not "played a significant supervisory role" in the [plaintiff's] work, or, more particularly, that the plaintiff was being supervised by the railroad's employees at the time of his injury." *Id.* at 327, 95 S.Ct. at 477. The Supreme Court's analysis in affirming the trial court's findings in *Kelley* is instructive: first, the court recognized and emphasized the distinction which is to be made between those circumstances where, as here, the railroad is charged with coordinating activities on its premises to insure "the necessary cooperation where the work furnished is a part of a larger

undertaking," and those circumstances wherein the railroad actually undertakes "the authoritative direction and control" necessary to make it a claimant's employer. *Id.* at 329, 95 S.Ct. at 478. The Court cited *Baker v. Texas & Pacific R. Co.*, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959), as illustrative of the degree of control necessary to the latter circumstance, a situation in which "a supervisor, admittedly in the employ of the railroad, in the daily course of the work exercises directive control over the details of the job performed by the individual workmen, including the precise point where a material mixture should be pumped and when the employees should move to the next point, and the consistency of the mixture."

The Court then concluded in *Kelley* that where the character of the contacts between the railroad and persons working on its premises are merely such as to reveal the accommodation and coordination which are clearly necessary to a large operation, FELA "employment" status will not be recognized. *Id.* 419 U.S. at 330, 95 S.Ct. at 479. Instead, the contacts between the two groups "must assume a supervisory character before the [contractor's] employees can be deemed *pro hac vice* employees of the railroad." *Id.* In explaining what "supervisory character" means, the court further concluded that: ". . . immediate control and supervision is critical" to a recognition of the existence of such control. *Id.*, fn. 10. Upon the basis of such conclusion, the Supreme Court upheld the District Court's conclusion that the plaintiff was not an employee of the railroad. *Id.* at 333, 95 S.Ct. at 480.

In the cases decided since *Kelley* which have discussed the factors necessary to the "immediate control and supervision" deemed necessary by the Supreme Court, the courts have held that the issue of control should turn upon such factors as whether: 1) the railroad's supervisory personnel determined the number of employees which a contractor could have; 2) approved or disapproved all wages and salaries; 3) decided what tools, materials and supplies should be purchased by the con-

tractors and used by their employees; 4) determined what cost items would be approved, with full accounts to be furnished to the railroad; 5) whether the title to all tools and materials vested in the railroad or the contractor; 6) whether the railroad retained substantially full control over the work; 7) whether such work was an integral part of the railroad's own operations; and 8) whether the contract between the railroad and the contractor required the railroad to control and supervise all such activities. *See, generally, Turpin v. Chicago, Burlington & Quincy R.R. Co.,* 403 S.W.2d 233 (Mo.1966); *Allbritton Communications Co. v. N.L.R.B.,* 766 F.2d 812, 819 (3d Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986); *Taras v. Baker,* 411 F.Supp. 426, 428 (E.D.Pa.1975), *aff'd,* 535 F.2d 1245 (3d Cir. 1976).

The record in the instant case is void of any evidence that MoPac exercised the kind of control considered necessary by the courts to fall within the parameters of FELA coverage; it demonstrates that the only control exercised was the kind which is necessarily exercised "in the interest of cooperation," an interest repeatedly emphasized throughout the contract, stemming from the multiple right-of-way uses which were mandated by law. Specifically, there is no evidence that MoPac approved or disapproved the wages and salaries paid by Sprint and its subcontractors, decided what equipment, tools, materials or supplies should be purchased or used, or determined what cost items should be approved. MoPac had no title to any of the equipment used by Sprint or its subcontractors, and did not supervise and/or control their activities within the meaning of those terms as used by the Supreme Court in *Kelley,* nor were the activities of Sprint or its subcontractors an integral part of the railroad's own operation. Although Steven Waits, MoPac's "designee," was charged with coordinating MoPac/Sprint right-of-way usage, he was only responsible for protecting MoPac's interests and making sure that no worker came in contact with the railroad operation.

Thus, while the danger to the workers from contact with the trains and protection of the Railroad's right-of-way were of concern to MoPac—for which reason it held safety meetings with the employees of the subcontractors to inform the workers of the dangers of working around the tracks and how to protect the right-of-way—his authority to stop the work was confined to situations in which *the structure of the track or movement of the trains* might become jeopardized.

There was no evidence that MoPac exercised any greater degree of control than that necessary to fulfill its contractual right and obligation to insure the integrity and safety of its own transportation activities and to insure that Sprint's activities did not in any manner jeopardize same. This did not amount to the authoritative control necessary to render the Plaintiff MoPac's borrowed, dual or subservant.

It is undisputed that MoPac, a common rail carrier, was engaged in interstate commerce. However, as has been stated, plaintiff, as an FELA claimant, was also required to prove that he was employed with duties furthering such commerce, and that he was injured while so employed. It is in light of this requirement that plaintiff's relationship to MoPac must be examined: plaintiff was an employee of a brush and debris-cleaning subcontractor (Brewer), which contracted with a cable-laying general contractor (Crawford), which contracted with a fibre optics telephone company (Sprint), which contracted to use a portion of MoPac's right-of-way upon which to lay its cable. The record is utterly devoid of any evidence that Sprint (or its contractors) was ever engaged in the furtherance of MoPac's interstate commerce activities as opposed to those of Sprint.

Plaintiff relied at trial upon the proposition that, although his duties may not have been in furtherance of MoPac's own interstate activities, they were in furtherance of Sprint's fibre optic cable business, in which MoPac participated by 1) maintaining a supervisory role over the laying of the fibre optics cable, and 2) by "making money"

from the lease of its right-of-way to U.S. Sprint. We do not agree.

Aside from the fact that such theory, even if sound, would fail to satisfy the requirement that a FELA claimant's work have been in furtherance of a railroad's interstate transportation activities, the theory is itself intrinsically flawed, depending as it does upon insupportable premises that: 1) MoPac had supervisory control over the laying of the cable; and 2) that a landowner may be deemed to be "engaged in interstate commerce" by merely receiving consideration for the lease of its right-of-way to one who is "engaged in interstate commerce." It should be remembered that Sprint is a preferred class of utility with a right to condemn, if necessary, the right of way in question. TEX.REV.CIV.STAT.ANN. arts. 1416, 1417 (Vernon 1980); *Mellon v. Southern Pacific Transport Co.*, 750 F.Supp. 226, 230–31 (W.D.Tex.1990).

In short, neither the responsibilities nor the benefits accruing to MoPac under the fibre optic agreement caused it to be engaged in Sprint's interstate commerce activities. Even had MoPac somehow become so "engaged," the FELA was not enacted to cover persons injured while in the furtherance of such activities; rather, it was enacted to cover injuries occurring in the furtherance of the business of interstate rail transportation. *Edwards v. Pacific Fruit Exp. Co.*, 390 U.S. 538, 88 S.Ct. 1239, 20 L.Ed.2d 112 (1968).

Plaintiff argues in his brief he "never found a railroad tie which had not been placed within this 'strip' from which he had to clear brush and clear cut"; he was, therefore, "forced by MoPac to remove the ties, along with his co-worker," and that plaintiff, "doing traditional railroad work in the removal of replaced railroad ties along a section of railroad which crosses state lines was properly an employee for FELA purposes." We disagree.

Plaintiff further argues in his brief that: MoPac's attack on the sufficiency of the evidence to establish that plaintiff was an employee of MoPac ignores the expert testimony of Dr. Vaughn Paul Adams, who has undergraduate degrees in mechanical engineering design, an M.S. in industrial engineering, and a Ph.D. from the Industrial Engineering Department of Texas A & M; that he is an expert in safety and human factors engineering who testified that plaintiff was the employee of MoPac at the time of the accident, and stated: My opinion is that for the purpose of job safety and job health, that the employee/employer of Mr. Buenrostro at the time of the accident then was the railroad.

Plaintiff further argues that Steven Waits, MoPac's Engineering Inspector of Fibre Optics, had the right to order someone like plaintiff to clear brush and pick up debris, as evidenced by Dr. Adams' answer to the question:

Q. Do you know whether or not he [Waits] had the right to actually tell someone like Mr. Buenrostro how to clear brush? Did he have the right pursuant to the contract?

A. As I read it, yes, he did.

Plaintiff concludes that, "according to Dr. Adams," MoPac, through Waits, had the right to tell employees of subcontractors what to do with respect to their ground movements, insofar as they involved health and safety, and that MoPac was in a position of superiority with respect to seeing to it that employees of all the subcontractors were acting in a safe and a reasonable way.

Under the Fibre Optics Agreement, MoPac had the sole discretion to place watchmen, flagmen, inspectors or supervisors for the protection of the railroad if it deemed it advisable; had the right to disapprove Sprint's selection of any contractor used on the project; and required Sprint and any subcontractors retained by Sprint to obtain specified insurance coverage with minimum limits. Plaintiff asserts that, according to Dr. Adams, these provisions in the Agreement demonstrated that MoPac had retained such a significant right of control so as to impose upon the railroad the obligation to exercise care with respect to the safety of plaintiff. Again, we disagree.

■ Next, we turn to Dr. Adams' testimony. His testimony is based on his interpretation of the Fibre Optics Agreement and his conclusion "that crossties are an integral post of the railroad's interstate activities" has no probative value since he did not demonstrate any expertise in interpreting the FELA's interstate requirement. Moreover, he is not qualified to assert that abandoned railroad ties left in an area of right-of-way which is later leased to a third party for purposes unrelated to railroading nonetheless constitute an integral part of a railroad's ongoing interstate operations, or that the employee of a sub-sub-contractor of a telephone company somehow becomes engaged in a railroad's interstate commerce by clearing a right-of-way on a railroad right-of-way to be used for interstate telephone services. Such assertions are contrary to established authority relative to what constitutes interstate railroading activities for purposes of the FELA. *Cf. Edwards v. Pacific Fruit Express Co.*, 390 U.S. at 538, 88 S.Ct. at 1239; *Robinson v. Baltimore & Ohio R.R.*, 237 U.S. 84, 35 S.Ct. 491, 59 L.Ed. 849 (1915), which held that a Pullman car porter was not an employee of the railroad under the FELA. Finally, Dr. Adams was not a lawyer and was not competent to express an opinion as to the meaning of terms and provisions in the Fibre Optics Agreement, or of the effect of the Agreement itself; nor was it established that he was an expert on the coverage of the FELA or in the broad field of interstate commerce.

■ It is settled law that a witness who, by his knowledge, skill, experience, training, or education, has specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact question in issue, may express an opinion about the matter. *Trailways, Inc. v. Clark*, 794 S.W.2d 479, 483 (Tex.App.—Corpus Christi 1990, writ denied). In order for an expert's testimony to be competent, it must be shown that he or she is trained in the science of which they testify, or have knowledge of the subject matter of the fact issue in question. *Rogers v. Gonzales*, 654 S.W.2d 509, 512 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.); *Clark v. Cotten*,

573 S.W.2d 886, 887 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.). Further, incompetent opinion testimony is not evidence, and a causation finding supported only by such testimony fails a "no evidence" challenge. *Garrett Outdoor Co. of Texas v. Kubeczka*, 710 S.W.2d 79, 89 (Tex. App.—Houston [14th Dist.] 1986, no writ). Moreover, the expert in stating his opinion must be restricted to his particular field. *Adamson v. Burgle*, 186 S.W.2d 388, 397 (Tex.Civ.App.—San Antonio 1945, writ ref'd). The legal conclusion of Dr. Adams that under the contract Waits had the right to tell plaintiff (and his co-workers) "how to clear brush," even though not objected to by MoPac, has no probative value. Plaintiff failed to meet his burden of proving that he was an employee of MoPac, or a borrowed, dual or sub-servant of MoPac because the provisions of the Fibre Optics Agreement conclusively negated the existence of a right of control; and there was, in any event, no evidence that MoPac exercised the control necessary to make it plaintiff's employer so as entitle plaintiff to FELA coverage, and there was no evidence that plaintiff was engaged in the furtherance of the interstate commerce activities of MoPac. There was no evidence that MoPac ever exercised any control other than that necessary to assure the integrity of any control other than that necessary to assure the integrity of its own rail transportation functions, which was as a matter of law insufficient to establish that plaintiff was its employee, borrowed servant, dual servant or sub-servant. We hold that plaintiff failed to meet his burden of proving entitlement to the recovery of benefits under the FELA. MoPac's second point of error is sustained.

MoPac further contends in its tenth point of error that there is no evidence to support the jury's finding in response to Special Issue No. 4 (that the negligence of MoPac proximately caused plaintiff's injuries).

■ It is well settled that, in order to establish liability for negligent conduct, a plaintiff must prove that the defendant owed him a legal duty of care, the breach

of which proximately caused his injuries. *Abalos v. Oil Development Co. of Texas*, 544 S.W.2d 627, 631 (Tex.1976); *Coleman v. Hudson Gas & Oil Corp.*, 455 S.W.2d 701 (Tex.1970); *Prestwood v. Taylor*, 728 S.W.2d 455, 459 (Tex.App.—Austin 1987, writ ref'd n.r.e.). Proof of negligence requires proof of the existence, as well as the breach, of such a duty. Moreover, when an unsafe premises condition is alleged to have been the cause of the plaintiff's injury, he must additionally prove that his injury resulted from the complained-of condition. *Tanner v. BDK Production Co.*, 671 S.W.2d 941, 945 (Tex.App.—Corpus Christi 1984, no writ). Plaintiff's theory that such a duty existed rests upon the "control" analysis found in Restatement (Second) of Torts § 414, and adopted by the Texas Supreme Court in *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985), i.e., that one who entrusts work to an independent contractor but retains control over some part of the work is liable for any harm caused by his failure to exercise such control with proper degree of care. The problem with such analysis in a case such as the instant one is that it omits consideration of the threshold issue of whether MoPac was the "possessor" of the premises to begin with, a question which, if answered in the negative, obviates the necessity of an inquiry into the premises "possessor's control over the work of the contractor."

> The Supreme Court stated in *Redinger:*
> We will first consider whether a general contractor has a duty to a subcontractor's employee, and, if so, whether there is evidence in this case that the duty was breached. An owner or occupier of land has a duty to use reasonable care to keep the premises under his control in a safe condition. *Smith v. Henger*, 148 Tex. 456, 226 S.W.2d 425 (1950). A general contractor on a construction site, who is in control of the premises, is charted with the same duty as an owner or occupier. *Id.*, 226 S.W.2d, at 431. This duty to keep the premises in a safe condition may subject the general contractor to direct liability for negligence in two situations: (1) those arising from a premises defect, (2) those arising from an activity

or instrumentality. *J.A. Robinson Sons, Inc. v. Ellis*, 412 S.W.2d 728 (Tex.Civ. App.—Amarillo 1967, writ ref'd n.r.e.); *Moore v. Texas Company*, 299 S.W.2d 401 (Tex.Civ.App.—El Paso 1956, writ ref'd n.r.e.). This is not a premises defect case. Rather, this case involves an injury caused by an activity conducted on the premises.

*Redinger*, 689 S.W.2d at 417.

The Court further observed that the general rule "is that an owner or occupier does not have a duty that an independent contractor performs work in a safe manner," citing *Abalos v. Oil Development Co.*, 544 S.W.2d at 631, which held:

> [W]here the activity is conducted by, and is under the control of, an independent contractor, and where the danger arises out of the activity staff, the responsibility or duty is that of the independent contractor, and not that of the owner of the premises ...

In the instant case, plaintiff clearly staked his second claim upon a premises liability theory of recovery which alleged that he was injured as a result of a dangerous premises condition—i.e., that MoPac was allegedly negligent "in failing to foresee the inevitable result of the continued failure to correct and/or maintain a dangerous condition on the premises." He did not allege that MoPac's liability arose out of an activity conducted on the premises.

In *Prestwood v. Taylor*, 728 S.W.2d 455 (Tex.App.—Austin 1987, writ ref'd n.r.e.), Prestwood owned a two-story building, and leased part of the building which housed a freight elevator that served both levels of the building to a tenant. Later, the tenant was held to be bankrupt, and Taylor was appointed trustee for the Bankrupt estate. On July 10, 1981, Taylor, while on the second floor of the building, stepped onto the elevator, which gave way and he fell to the first floor and sustained injuries. Taylor sued Prestwood, contending that her negligence was a proximate cause of her injuries. The trial court rendered a judgment for damages in favor of Taylor, solely on the basis that Prestwood was negligent in failing to discover the dangerous condi-

tion of the elevator. The Court of Appeals reversed the trial court's judgment and rendered judgment that Taylor take nothing. At trial, it was agreed by both Prestwood and Taylor that Prestwood delivered a key to the premises formerly occupied by the tenant to Taylor so that he could control access to the building. Concerning the matter of duty owed by Prestwood to Taylor, the Court of Appeals observed:

> In the present case, the duty in question may not be imputed to Prestwood unless the evidence shows that she was a "possessor" of the premises wherein the elevator was situated. Restatement (Second) of Torts §§ 342 and 343. The word "possessor" has a technical meaning in this context. Prestwood would not necessarily be a "possessor" of the premises, upon whom liability could be predicated, owing to the fact that she held legal title to the premises or the legal right to immediate possession. *Cameron County v. Velasquez*, 668 S.W.2d 776 (Tex. App.1984, writ ref'd n.r.e.); *see also Hernandez v. Heldenfels*, 374 S.W.2d 196 (Tex.1963). Instead, the legal status of "possessor" is a conclusion inferred from certain other underlying facts that must themselves be proved. These are set out in § 328E of the Restatement, which defines "possessor" as any of the following:
>
>> (a) a person who is in occupation of the land with intent to control it, or
>> (b) a person who has been in occupation of the land with intent to control it, if no other person has subsequently occupied it with intent to control it, or
>> (c) a person who is entitled to immediate occupation of the land, if no other person is in possession under clauses (a) and (b).

*Prestwood*, 728 S.W.2d at 459–60.

Thus, according to *Prestwood*, where a lessor transfers to his lessee the right of possession, and the lessee occupies the land with the intent to exercise the right of control given him in the lease contract, "the lessor's liability for dangerous conditions on the premises terminates with such a transfer of possession to the lessee."

*See also* Restatement (Second) of Torts §§ 355, 356.

In order to be entitled to charge MoPac with a duty of care, it was therefore incumbent upon plaintiff to adduce evidence as to all the essential elements of at least one of the said definitions of the word "possessor." Just what evidence of "control" is necessary to show that a landlord is a "possessor" of premises within the meaning of Restatement (Second) of Torts § 328E is therefore highly relevant. To begin with, "[t]he 'control' which a landlord must intend to exercise is physical control or control in a factual sense."

In concluding that the landlord in *Prestwood* did not have such "control," the court held that even the landlord's retention of the means of controlling access to the premises and the exercise of such access are insufficient to bestow upon him the "physical control" or "control in a factual sense" referred to in Restatement (Second) of Torts § 328E(a). In landlord/tenant situations, the sufficiency of the degree of control necessary to impose such a duty is thus governed by the intent of the landlord to exercise the kind of control set forth in Restatement (Second) of Torts § 328E.

██ In the instant case, there was no evidence adduced that MoPac retained the kind of control which would indicate an "intent to possess" the portion of the right-of-way which it had leased to Sprint within the meaning of Restatement (Second) of Torts § 328E. The evidence demonstrated that, at the time Sprint leased the right-of-way from MoPac, the latter retained only the right to keep Sprint from interfering with the ongoing rail transportation activities which MoPac was conducting on its own, not in Sprint's portion of the right-of-way.

Thus, MoPac did not, as an initial matter, have a duty of care with respect to that portion of the right-of-way which it had leased to Sprint, and the plaintiff, whether intending to assert the existence of a dangerous premises condition as pleaded, or that MoPac had a duty to control Sprint's construction activities on the premises, failed to satisfy the threshold requirement

that MoPac have been the "possessor" of the premises. Accordingly, he failed to meet his burden upon his premises liability claim.

▇▇▇ Regarding plaintiff's specific assertion that MoPac was negligent ". . . in failing to foresee the inevitable result of the continued failure to correct and/or maintain a dangerous condition on the premises," assuming for the sake of argument that plaintiff had met his burden of proving that MoPac was the "possessor" of Sprint's portion of the right-of-way, there was no evidence whatsoever that a dangerous "condition" existed on the same, that such condition was unknown to plaintiff, or that the same caused plaintiff's injury. On the contrary, all of the evidence showed that plaintiff's injury was sustained while he was lifting a railroad crosstie, the existence of which he was fully aware. There was, moreover, no evidence that the presence of the railroad crossties posed a dangerous condition on the premises requiring MoPac to warn of their presence. *See, e.g., Tanner v. BDK Production Co.,* 671 S.W.2d at 945; *Seideneck v. Cal Bayreuther Associates,* 451 S.W.2d 752, 754 (Tex. 1970) (rug is not a dangerous condition); *Camp v. J.H. Kirkpatrick Co.,* 250 S.W.2d 413, 419 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.) (if a thing is generally supposed to be universally harmless, and only a specialist would foresee damage, a person who did not foresee it and had no warning is not liable).

Having failed to prove that the railroad crossties in question posed a dangerous condition on the premises requiring MoPac to warn of their presence, or that he was unaware of the existence of such condition, plaintiff failed to sustain his burden of demonstrating that he was, as alleged, injured by MoPac's failure to correct and/or [maintenance of] a dangerous condition on the premises.

As hereinbefore noted, MoPac did not retain any right to control the work being done by Sprint and its contractors. The only "control" retained by MoPac pertained to its legal duty, as a railroad common carrier, to ensure that the work of laying the fibre optic cable did not interfere with its own rail transportation activities which were being conducted on the portion of the premises which it had not leased to Sprint. There is no evidence that MoPac had the right to halt or interfere with the fibre optic construction activities other than to prevent same from interfering with Mo-Pac's own transportation activities. Neither the viability of the cable, the integrity of the construction activities, nor the safety of Sprint's workers were the responsibility of MoPac. The sole responsibility of Mo-Pac was to insure that Sprint's work did not adversely effect MoPac's own rail transportation activities on the adjoining portion of the premises which had been reserved to its sole and exclusive use.

This case is, therefore, clearly distinguishable from situations which occur in cases such as *Pollard v. Missouri Pacific R.R. Co.,* 759 S.W.2d 670 (Tex.1988), relied upon by plaintiff, wherein the defendant not only retained undisputed control over the premises, but in addition contractually retained the authority to specify work details such as—in the case of a contract to remove poles and wires from a railroad right-of-way—to determine which poles will actually be removed. *Id.* at 671. While the courts will find a duty of care in such circumstances, the circumstances themselves are completely unlike those in the case at bar. In the instant case, MoPac was not only *not* the "possessor" of the premises in question (having leased same to Sprint), but did not retain the contractual authority which was retained in *Pollard* to specify details of the work such as which items were to be removed from the premises. Specifically, it was not the responsibility of MoPac, which had, with great specificity, contractually relinquished any authority whatsoever over the clearing of brush and debris from the right-of-way, which crossties should be removed, or how they were to be removed.

Accordingly, MoPac did not fall within that category of landowners who, by retaining some right of control over construction integrity of worker safety, retain also a duty to exercise such control carefully.

*See, e.g., Exxon Corp. v. Quinn,* 726 S.W.2d 17, 20 (Tex.1987). There was no evidence to support the jury's response to Special Issue No. 4. MoPac's tenth point of error is sustained.

Since there is no evidence to support the jury's responses to Special Issues Nos. 1 and 4, we conclude that the judgment of the trial court must be reversed and judgment rendered that plaintiff take nothing by his suit. Therefore, it is not necessary that we reach MoPac's remaining points of error.

The judgment of the trial court is reversed and judgment is rendered that plaintiff take nothing by his suit against Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company.