Jimmie **NEWSOM**, Appellant,

v.

O.P. **WHITTINGTON**, Appellee.

No. 06–96–00092–CV.

Court of Appeals of Texas,
Texarkana.

Argued July 23, 1997.

Decided Aug. 13, 1997.

Rehearing Overruled Oct. 28, 1997.

Carnegie H. Mims, Jr., Jefferson & Mims, Houston, for appellant.

Maxine D. Goodman, Karen R. Dow, Carrigan, Lapin, Landa, Wilde, Houston, for appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

ROSS, Justice.

Jimmie Newsom brought this cause of action, claiming damages from a fire originat-

ing on O.P. Whittington's property. Newsom appeals from a judgment finding that Whittington did not negligently permit the accumulation of debris on land that he possessed. In his points of error, Newsom claims Whittington was negligent as a matter of law and that the jury verdict was not supported by the evidence or was against the great weight and preponderance of the evidence. He also claims that Whittington was negligent per se because he violated the Houston fire code, that the evidence was factually insufficient to support the jury's damages finding, and that the judgment was erroneous because it was based on irreconcilable jury answers. The judgment is affirmed.

## I.

### Facts

This case concerns a fire that started in some mattress debris behind a business called Slumberland on Old Spanish Trail in Houston.

#### A. Whittington's Property

In November 1989, Whittington purchased a piece of property fronting Old Spanish Trail on the south and Griggs Road on the north. The portion fronting Old Spanish Trail was already occupied by a used mattress company called Slumberland, owned by Samuel O. Pitts. When he purchased the property, Whittington got a price reduction in order to pay for a massive cleanup of the area occupied by Slumberland. In the months after he purchased the property, Whittington arranged for repairs to the building occupied by Slumberland and arranged for the cleanup of the portion of the open yard used by Slumberland. Whittington used the property not occupied by Pitts to operate General Supply & Equipment (Gensco), which collected and sold used aircraft tires.

Whittington's property had three buildings on it: a masonry building, a metal warehouse, and a metal shed. Whittington testified that soon after he purchased the property, he orally agreed to lease to Pitts the masonry building, part of the metal warehouse, and part of the open yard next to the masonry building. On December 28, 1989, Whittington and Slumberland's manager signed a written lease under which Pitts leased the masonry building. It is also undisputed that Whittington allowed Pitts to use a portion of the metal warehouse, even though the warehouse was not listed on the lease.

There is some dispute concerning Pitts' control over a portion of the open yard. Whittington testified that he permitted Pitts to occupy a portion of the open yard. He considered this area to be "an extension of the lease," pursuant to an "oral agreement." Pitts could not recall Whittington leasing any part of the open yard to him. He regarded the open yard as Whittington's property, over which Whittington had complete authority. Pitts believed that Whittington had the final say regarding what could be stored in the open yard. Pitts testified that Whittington had complete physical control over the open yard. Whittington disagreed. He testified that (1) Pitts had control over a portion of the open yard; (2) Whittington could only enter the portion controlled by Pitts to make repairs called for by the lease contract; and (3) Whittington could not enter Pitts' portion in order to clean up Pitts' trash. Regardless, Pitts conceded that he used a portion of the open yard. Pitts also conceded that Whittington never helped him clean up his portion of the open yard. Pitts understood that he could use a portion of the open yard.

Whittington also testified that he had an unwritten agreement to perform some of the "major" repairs on the masonry building, while Pitts had the obligation to perform "routine" repairs. Pitts recalled Whittington making some repairs to his leased property; however, Pitts testified that he would have performed minor repairs.

Bill McGee, manager of Gensco's Griggs Road location, testified that Whittington's employees occasionally used an entrance gate next to Slumberland. However, Whittington testified that his employees never used the gate because it belonged to Pitts. Pitts testified that Whittington's employees had access to the gate, but he could not remember a specific occasion when they used the gate.

Kenneth Oleni, Gensco's yard supervisor, testified that he never used Slumberland's gate.

Pitts testified that he permitted Jack Carroll and his wife to live at Slumberland. Mrs. Carroll was Pitts' secretary. Mr. Carroll occasionally performed odd jobs for Pitts.

On August 15, 1990, Whittington sent a letter to Pitts. It read:

Dear Sam:

I am attaching a handwritten memo from my Manager, Bill McGee, who was in your location yesterday.

We are making an effort to get our work done on the electrical problems. However, it appears you are inviting serious problems particularly with your housekeeping.

The memo from McGee to Whittington read:

Whit,

Ref—4013 O.S.T.

I believe there is a lot of clean-up that Sam's people need to do inside the bldg. There is a lot of cloth, cotton, wood materials scattered in the rear part of the bldg. where there are no lights. If the bldg. inspector sees that he will certainly condemn it as a fire hazard.

On July 12, 1991, Lee Island, apparently an employee of the City of Houston, performed a fire inspection of the Slumberland premises. He issued a "General Fire Inspection Report," listing five violations of the fire code:

Accumulations of trash and rubbish could be used to kindle or feed a fire. Conditions such as these would allow fire to gain headway and thereby result in more fire damage (clean up all trash & rubbish).

Provide and install (3) 2A10BC fire extinguishers with current date tags.

Replace all missing covers on electrical outlets.

Provide and maintain access to fire extinguisher at all times.

Provide 8' aisles in width for high pile stock.

The "trash and rubbish" was located both inside and outside the Slumberland building. Island testified that if the violations were not corrected by July 28, 1991, a citation would have been issued. There is no evidence that any of the violations were corrected before the fire.

### B. Newsom's Property

In 1984 or 1985, Newsom purchased property located adjacent to the property that Whittington would eventually own. A large warehouse was located on Newsom's property. For a time, Newsom rented part of the warehouse to Lurline Turner, who was in the used tire business. Turner moved out a few months before the fire, but left behind many tires, both inside and outside the warehouse. Newsom estimated that there were 2,500 tires inside the warehouse. Pictures taken inside the warehouse after the fire clearly show numerous tires amidst the rubble. Newsom used the warehouse to store equipment used in his housing, restaurant, nightclub, and vending machine businesses.

### C. The Fire

The fire occurred on the afternoon of July 14, 1991. It destroyed Slumberland, Whittington's property, and Newsom's property. There is no dispute over how the fire started. The fire department's "Original Investigation Report" stated:

The cause of the fire is incendiary, due to the absence of normal or natural fire hazards at the point of origin. The exact point of origin is on the exterior west side of the building where a mattress was ignited. The fire spread from this mattress to tires in the storage shed and went on to spread to three other exposures.

This report listed Slumberland's address as the location of the fire. The fire department investigators eventually concluded that Carroll accidentally set the fire:

During this interview with Jack Lynn Carrol (sic) this investigator took a statement which is in the form of a voluntary statement of admission by Jack Lynn Carrol (sic) that he accidentally caused the fire at 4013 Old Spanish Trail which was a multiple alarm fire (3–11) by carelessly discarding a smoking material while attempting to barbecue, the reason the fire was of the magnitude or got out of control because of his delay in contacting the fire

department and also he tried to extinguish the fire himself before calling the fire department. In this statement Carrol (sic) did state that he unconsciously threw a cigarette into some mattress debris and unknowingly did not pay attention to his actions until after he had gathered some fire wood from some old box springs to use as wood for his pit, when he did notice the fire approximately 15 to 20 minutes had past (sic) and the fire had gotten going real good. . . . It should further be known that this case should be declared cleared by the admission of the employee of this business Jack Lynn Carrol (sic). . . .

Fred Moore, an arson investigator with the Houston Fire Department, confirmed that the fire started directly behind the Slumberland building.

### D. The Lawsuit

Newsom sued Whittington for negligence. The jury charge's first question asked whether Whittington "permitted accumulations of wastepaper, litter or comustible (sic) or flammable waste, waste petroleum products, or rubbish to remain in a portion of the property of which he was a 'possessor.'" The jury answered "no." If they had answered "yes," they were to answer whether Whittington's conduct was negligent and proximately caused Newsom's damages. The charge also asked whether Newsom permitted accumulations of waste on property which he possessed. The jury found that Newsom did permit accumulations of waste. Such action was negligent, but did not proximately cause Newsom's damages. Finally, the jury found $29,450.00 in damages to Newsom, equalling $19,450.00 in damage to the building and land and $10,000.00 in damage to the contents of Newsom's building. Based upon the jury's "no" answer to the first question, the court rendered judgment for Whittington.

## II.

### Sufficiency to Support Finding of No Liability

Newsom argues that Whittington was negligent as a matter of law and that the jury's verdict was against the great weight and preponderance of the evidence. In re-

viewing a "matter of law" point of error, we consider all the evidence and sustain the point of error if the converse of the finding is established conclusively. *Turner v. State,* 850 S.W.2d 210, 212 n. 1 (Tex.App.-Texarkana 1993, no writ). In reviewing a factual sufficiency point of error, we consider all of the evidence that is relevant to the fact being challenged. We will reverse only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

"[A] defendant's duty to protect a plaintiff from defects on a premises arises from his control or ownership of it; the duty does not extend beyond the limits of a defendant's control." *LaFleur v. Astrodome–Astrohall Stadium Corp.,* 751 S.W.2d 563, 565 (Tex.App.-Houston [1st Dist.] 1988, no writ). "An occupier of premises has no greater duty than does the public generally regarding conditions existing outside his premises and not caused by the occupier." *Portillo v. Housing Auth.,* 652 S.W.2d 568, 569 (Tex.App.-El Paso 1983, no writ). A party is liable only for defects upon premises that it controls. *Gunn v. Harris Methodist Affiliated Hosps.,* 887 S.W.2d 248, 251 (Tex.App.-Fort Worth 1994, writ denied). A party controls a premises if it is a "possessor," as defined by RESTATEMENT (SECOND) OF TORTS § 328E (1965). *Gunn,* 887 S.W.2d at 251; *Missouri Pac. R.R. Co. v. Buenrostro,* 853 S.W.2d 66, 79 (Tex.App.-San Antonio 1993, writ denied); *Prestwood v. Taylor,* 728 S.W.2d 455, 459–60 (Tex.App.-Austin 1987, writ ref'd n.r.e.). Section 328E defines a "possessor" as:

(a) a person who is in occupation of the land with intent to control it or

(b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

(c) a person who is entitled to immediate occupation of the land, if no other person is in possession under Clauses (a) and (b).

The jury was instructed to apply the Restatement's definition of "possessor" when answering question one. The jury was also

instructed that "[a] person is not necessarily a 'possessor' of property merely because he has legal title to the property or has the legal right to immediate possession."

■ Newsom argues that the jury's answer to the first question was against the great weight and preponderance of the evidence because Whittington owned the land on which the fire started and controlled much of the land over which the fire spread. Newsom contends that this proves Whittington's negligence as a matter of law. A party cannot be held liable as a possessor merely because he has legal title to the premises. *Prestwood*, 728 S.W.2d at 459. "[A] lessor's liability for dangerous conditions on the premises terminates with ... a transfer of possession to the lessee." *Id.* at 460; RE-STATEMENT (SECOND) OF TORTS §§ 355, 356 (1965). For example, in *Prestwood*, the plaintiff recovered for injuries he received when he fell on a freight elevator in a building owned by Prestwood. In May 1980, Prestwood had leased to a tenant part of the building, including the freight elevator. About a year later, the tenant ceased paying rent. *Prestwood*, 728 S.W.2d at 457. Thereafter, the following events transpired:

> In the late spring of 1981, the tenant began to suffer financial problems. He ceased paying Prestwood the agreed rentals and failed to pay other creditors as well. Several of the tenant's other creditors obtained against him a judgment which included an order directing the sale of certain of the tenant's personal property in which the creditors had a security interest. In execution of the order, the sheriff on May 27, 1981, secured the contents of the leased premises, in preparation for the sale, by changing the locks on the doors. About the same time, Prestwood obtained against the tenant a judgment in an action for forcible entry and detainer, brought by her to regain possession of the leased premises following notice to the tenant that she elected to terminate the lease for his failure to pay rent.... Writs of execution and restitution were issued June 2, 1981 in enforcement of this judgment. They were returned *nulla bona*, however, because the serving officer evidently determined they could not be executed owing

> either to the locks placed on the premises by the sheriff or the bankruptcy proceedings....

*Id.* On July 10, 1981, Taylor, the trustee for the bankrupt estate, slipped on the freight elevator. *Id.* The court of appeals reversed his judgment against Prestwood, even though Prestwood had obtained a key to the premises and had shown it to new tenants. Prestwood had obtained the key from Taylor, who insisted that he had legal authority to control the premises because of his position as trustee. *Id.* at 460–61. Because "the right of possession is indivisible," Taylor's assertion of control precluded a finding that Prestwood possessed the premises. *Id.* at 460.

In *Missouri Pacific*, 853 S.W.2d at 68, Missouri Pacific ("MoPac") entered into an agreement to permit Sprint to use a portion of its right-of-way for the purpose of laying cable. Essentially, the agreement permitted both parties to use the right-of-way, with the caveat that neither was to interfere with the other's use. The plaintiff was injured while working for Sprint in the right-of-way. He recovered from MoPac for failure to warn of an alleged dangerous premises condition. *Id.* at 68–69. As in *Prestwood*, the court concluded that "the landlord's retention of the means of controlling access to the premises and the exercise of such access are insufficient to bestow upon him the 'physical control' or 'control in a factual sense' " necessary for a finding of possession. *Id.* at 79. Mo-Pac did not have the kind of control that would indicate an "intent to possess" the premises because MoPac "retained only the right to keep Sprint from interfering with the ongoing rail transportation activities." *Id.*

■ In short, it does not matter that Whittington's employees occasionally may have used Slumberland's gate. It also does not matter that Whittington possessed legal title to the property where Slumberland operated. Instead, the jury had sufficient evidence to conclude that Slumberland, not Whittington, exercised control over the area behind its building where it stored mattresses.

■ Newsom next contends that even if Whittington did not possess the area where

the fire started, there was insufficient evidence for the jury to conclude that Whittington did not permit "accumulations of wastepaper, litter or comustible (sic) or flammable waste, waste petroleum products, or rubbish to remain" on Gensco's premises. Newsom points out that Whittington indisputably stored tires on Gensco's premises. Newsom also notes that tires are petroleum products. However, there was sufficient evidence for the jury to conclude that Gensco's tires were not "waste petroleum products." "Waste" can be "anything unused, unproductive, or not properly utilized" or "anything left over or superfluous, as excess material or by-products, not of use for the work in hand." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2146 (2d ed.1987). The evidence indicates that Gensco's tires were inventory for a very productive business. Therefore, the jury could conclude that Gensco's tires were not "waste." We overrule Newsom's sufficiency points of error.

### III.

### Negligence Per Se

■ Newsom argues that Whittington was negligent per se because Slumberland violated the fire code. It is unclear what Newsom is appealing here. He argues that because Whittington was negligent per se, "the jury's negative answer to first question (sic) was not supported by the evidence...." In other words, his negligence per se argument seems to be another part of his factual insufficiency argument. This is unavailing because the fire code violations do not tend to prove that Whittington possessed the area where the fire started. This point of error is overruled.

### IV.

### Irreconcilable Answers

■ Newsom's last point of error notes that the jury answered "yes" to jury question four: "Do you find that on the occasion in question that immediately prior to the fire in question, Jimmie Newsom permitted accumulations of wastepaper, litter or combustible or flammable waste, waste petroleum products, or rubbish to remain in a portion of his property?" This answer is supported only by the evidence that Newsom left Turner's scrap tires on his property. Newsom argues that this finding is irreconcilable with the jury's answer to question one, finding that Whittington did not permit accumulations of waste petroleum products on his property. However, as noted above, Whittington's tires were not "waste." In contrast, it is undisputed that Newsom was not using the tires on his property. Therefore, the jury could conclude that Newsom's tires were "waste." As a result, the answers are not irreconcilable. Furthermore, "[i]n reviewing the jury findings for conflict, the threshold question is whether the findings are about the same material fact." *Bender v. Southern Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). Question one concerned accumulations on Whittington's property, whereas question four concerned accumulations on Newsom's property. Therefore, the findings do not concern the same material fact. Regardless, the record does not reflect that Newsom objected to the allegedly conflicting jury answers before the jury was discharged. Therefore, this point of error is waived. *Torres v. Caterpillar, Inc.*, 928 S.W.2d 233, 244 (Tex.App.-San Antonio 1996, writ denied). Therefore, Newsom's last point of error is overruled.

Because we affirm the jury's finding of no liability, we decline to address whether the evidence was sufficient to support the jury's damages findings.