*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*





## OPINION

No. 04-10-00566-CV

Juan Gerardo **OLIVA**,
Appellant

v.

Pioquinto Ramon **DAVILA**,
Appellee

From the 341st Judicial District Court, Webb County, Texas
Trial Court No. 2009CVQ000888D3
Honorable Elma T. Salinas Ender, Judge Presiding

Opinion by:   Sandee Bryan Marion, Justice

Sitting:       Karen Angelini, Justice
               Sandee Bryan Marion, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  December 14, 2011

REVERSED AND RENDERED

This is an appeal from a jury verdict in favor of appellee following a suit for slander. Because we conclude the evidence is legally insufficient to support the jury findings on liability and on damages, we reverse and render a take-nothing judgment against appellee and in favor of appellant.

**BACKGROUND**

Appellant, Juan Oliva, and appellee, Pioquinto Davila, have known each other since the late 1970's when Oliva dated Davila's niece, Rosina.  Oliva and Rosina eventually married and the two families remained close for almost thirty years.  In 1994, after working in other cities in Texas, Oliva returned to Laredo to begin work with the U.S. Customs Service.  Oliva, a licensed CPA, began to prepare Davila's tax returns.  Davila's wife designated Oliva as the executor of her will.  Davila and his wife had no children.

In 2000, Davila asked Oliva for assistance with his estate planning.  According to Oliva, Davila wanted to leave a substantial portion of his estate to Rosina because Davila said he was Rosina's father.  Davila began researching the estate issues, including family partnerships and gifts.  Davila eventually decided to use a trust as the vehicle to handle his estate and he sought the assistance of a company known as The Estate Plan, which provided estate planning services and attorneys to help create trusts.  A Texas attorney represented Davila and his wife, and, in 2001, they executed a trust.  The trust provided that upon the death of both Davilas, their estate would be distributed to approximately twenty of Davila's relatives, including Rosina and the four Oliva children.  The Davilas were trustees of the trust during their lifetime, with Oliva as a successor trustee.  The trust was fully revocable during the Davilas' lifetime and partially revocable upon the death of either Mr. or Mrs. Davila.

In 2001, Mrs. Davila fell and had to be hospitalized.  The Davilas later hired a Mexican citizen, Guadalupe Lozano, to care for Mrs. Davila.  Eventually, Mrs. Davila moved to a nursing home, and she died in early 2003.  At this time, Oliva and Davila were still close, and Oliva handled the arrangements for Mrs. Davila's funeral.  Oliva began to notice that Davila and Lozano, who is forty-two years younger than Davila, were becoming romantically involved.  In

2007, Oliva was assisting Davila with his telephone bill when Oliva discovered approximately $50,000 in checks from Davila's account had been written to Lozano and another $20,000 to cash. Over the next several days, Oliva met with Davila and Davila's siblings to discuss the disbursements to Lozano. Oliva, concerned that the gifts to Lozano consisted of trust property and that Lozano may have influenced Davila to dispose of trust assets, asked for a trust accounting. Davila's and Oliva's relationship eventually became adversarial, and they both hired attorneys.

On or about July 5, 2008, Oliva went to a vacant house owned by Davila to remove his [Oliva's] personal property, which Davila had allowed him to store in the house.[1] Because the locks had been changed, Davila's brother came to the house and unlocked the door for Oliva. Once inside the house, Oliva discovered the house had been ransacked and numerous items of his personal property were missing. On the advice of his attorney, Oliva filed a police report. The police "case report" states the "reporting party [Oliva] stated to police that an unknown subject(s) committed the said offenses at 2017 Maryland." Oliva later spoke with an investigator with the Laredo Police Department, Roberto Reyes, who instructed Oliva to prepare an inventory of the missing items. Oliva gave Reyes an inventory captioned "CONFIDENTIAL PERSONAL SENSITIVE INFORMATION – DO NOT DISCLOSE TO PUBLIC." As part of the inventory, Oliva provided background information, a description of the missing items, and the names of witnesses. Oliva also identified as potential suspects the seven people, including Davila, who had access to the house. Davila later admitted he instructed people to remove items from the house, including some of the property listed on Oliva's inventory. No criminal charges were ever filed and the case was closed three months later.

---

[1] The house, located at 2017 Maryland, Laredo, Texas, is on the same property as Davila's house which faces Musser Street.

In 2008, in connection with a separate lawsuit between Oliva and Davila, Davila and Rosina agreed to a DNA test to determine whether he was her biological father. The results indicated he was not.

On May 27, 2009, Davila sued Oliva claiming Oliva had slandered him by saying he was Rosina's father and by reporting the missing property to the police and accusing Davila of having stolen the property. Trial commenced on March 30, 2010. On the second day of trial, Oliva's attorneys filed a Motion for Leave to File an Amended Answer, which included the defenses of limitations and substantial truth. The trial court denied the motion. The case was submitted to the jury on a charge that consisted of twenty-two questions. The jury returned a verdict in Davila's favor on his claims for defamation and intentional infliction of emotional distress. Oliva's motion for new trial was overruled by operation of law, and this appeal ensued.

## MOTION FOR LEAVE TO FILE AMENDED ANSWER

In its pretrial scheduling order, the trial court set December 9, 2009 as the deadline for any amended pleadings filed by the defendant, Oliva. Trial commenced on March 30, 2010. Oliva filed his Motion for Leave to File First Amended Answer the next day, which the court denied. On appeal, Oliva asserts the trial court erred in denying his motion, which raised several new affirmative defenses, including the statute of limitations and substantial truth.

Pleadings may be amended within seven days of trial "only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party." TEX. R. CIV. P. 63. Under Rule 63, a trial court has no discretion to refuse an amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh v. Serv.*

*Lloyds Ins. Co.*, 787 S.W.2d 938, 940–41 (Tex. 1990) (holding amendment proper and mandatory because amendment was of a formal, procedural nature that merely conformed pleadings to the evidence at trial and did not result in surprise or prejudice); *Hardin v. Hardin*, 597 S.W.2d 347, 350 (Tex. 1980) (holding amendment was not proper or mandatory because amendment was substantive in that it added affirmative defenses and, thus, changed the nature of the trial itself).  Also, when it appears the new claim or defense was known to the party seeking to file the amendment, or by reasonable diligence, it could have been known at such a time as would have enabled the party to include it in his former plea, the request should be denied.  *Mo. Pac. R. Co. v. Buenrostro*, 853 S.W.2d 66, 71 (Tex. App.—San Antonio 1993, writ denied). When, as here, amendments that introduce new substantive matters have been refused by the court under Rule 63, the burden of showing an abuse of discretion is on the complaining party, rather than on the opposite party to show surprise.  *Hardin*, 597 S.W.2d at 349.

## A.     Limitations Defense

Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse.  *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).  A claim for slander must be brought not later than one year after the day the cause of action accrues.  TEX. CIV. PRAC. & REM. CODE ANN. § 16.002(a) (West 2002).  The arguments made here by Oliva are similar to those considered and rejected by a panel of this court in *Buenrostro*.  Here, as in that case, Oliva contends that raising the defense of limitations would not have surprised or prejudiced Davila because Davila's own pleadings demonstrated the defense of limitations[2] and Davila should have anticipated the defense.[3]  Also here, as in

---

[2]  Oliva points to language in Davila's original petition which alleged each of Oliva's actions "were continuous and/or continuing torts," language Oliva asserts is a tolling provision allowing a party to avoid limitations.

*Buenrostro*, Oliva contends the amendment would not require Davila to present any new facts to prove his case, but instead, would have merely required him to show the dates upon which the defamatory statements were made and how they occurred within the applicable limitations period. Finally, Oliva contends allowing the amendment would not have prejudiced Davila's presentation of his case because Davila's attorney examined Oliva during Oliva's deposition about the dates of the statements concerning Davila's paternity; two of Davila's siblings to whom Oliva admitted publishing the statement testified at trial; and Davila could have called as a witness his own attorney who in his questions to Oliva said Oliva published the statement to him.

On the other hand, Davila argues Oliva waited until after the deadline set in the scheduling order to file his motion for leave to amend and did not do so until the eve of trial.[4] Davila's attorney also argued before the trial court that an amendment would amount to both surprise and prejudice because he did not cross-examine Oliva during his deposition regarding the time period in which he made the statements and Davila did not have an opportunity to seek that information from other witnesses. Finally, Davila relies on Oliva's concession in his brief on appeal that Oliva's "trial attorneys neglected the case and did not raise the affirmative defense of . . . limitations, did not respond to [Davila's] Request for Disclosure, did not participate in preparing the Joint Pre-Trial Order, and did not attend the pre-trial conference."

Based on this record, the trial court could have concluded that the addition of a limitations defense would reshape the nature of this case in a fundamental way. If Oliva had asserted the defense during the discovery period, Davila could have conducted appropriate

---

[3] Oliva relies on his own special exceptions that asked Davila to plead dates upon which the defamatory statements were allegedly made. During arguments to the court, Oliva's attorney admitted that although he filed the special exceptions, he did not urge them.

[4] Here, as in *Buenrostro*, the request to amend came after voir dire of the jury panel had been completed and the jury had been selected.

discovery. But because Oliva waited to raise the defense of limitations until after trial began, Davila was prevented from conducting relevant discovery and developing an appropriate response to a limitations defense. Thus, the trial court could have reasonably concluded that a trial amendment adding the defense of limitations at this stage in the litigation would have been prejudicial to Davila. Also, the trial court could have reasonably concluded that Oliva in the exercise of due diligence should have anticipated and pleaded the affirmative defense of limitations. Accordingly, the trial court acted within its discretion in denying Oliva's motion for leave to file an amended answer that included a limitations defense. *See Buenrostro*, 853 S.W.2d at 70–71 (holding trial court did not abuse its discretion in denying request for trial amendment injecting a new defense that would have prejudiced plaintiff).

## B.      Substantial Truth Defense

In a suit brought by a private individual, such as here, substantial truth is an affirmative defense to a claim of slander. *Randall's Food Mkts.*, 891 S.W.2d at 646. Oliva did not plead this defense in his answer. However, in addition to his complaint that the trial court erred in denying his motion to amend, Oliva also contends the issue of falsity was tried by consent. We agree the issue of falsity was tried by consent. The question of whether the statements on which the slander suit is based were false was submitted to the jury. When, as here, there are no objections to the questions submitted to the jury, we measure the sufficiency of the evidence by the jury charge as it was submitted. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *see also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000) ("Since neither party objected to this instruction [regarding malice], we are bound to review the evidence in light of this definition."); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the

opposing party fails to object to the charge."). Thus, even if the trial court properly denied the motion to amend to add the substantial truth defense, we may consider on appeal Oliva's challenge to the sufficiency of the evidence supporting the jury's finding that the statements were false because the question of falsity was presented to the jury.

## DIRECTED VERDICT

As a preliminary matter, Davila contends the trial court granted him a directed verdict on slander per se. We disagree.

A statement is slander per se if the statement imputes the commission of a crime, the contraction of a loathsome disease, or sexual misconduct, or causes injury to a person's office, business or profession. *In re Jennings*, 203 S.W.3d 32, 36 (Tex. App.—San Antonio 2006, orig. proceeding). The question of whether statements are slander per se is generally a matter of law to be decided by the court. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied).

At trial, Davila's attorney moved for a directed verdict "on three points": (1) this case involves a private plaintiff and not a public official or a public figure, (2) the defendant is a nonmedia defendant, and (3) "that the issue being presented to the court is a private issue as distinguished from a public issue that involves the community."[5] At no time did Davila's attorney ask the trial court to determine as a matter of law that Oliva's statements were defamatory per se. The trial court granted the directed verdict on only the three issues raised by Davila's attorney. Also, the trial court submitted to the jury questions on whether the statements

---

[5] The degree and burden of proof required in a defamation case hinges on the status of the plaintiff as either a public figure or private individual. For example, if the plaintiff is a private individual, the plaintiff must show the defendant acted with negligence regarding the truth of the alleged statement. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1988). If the plaintiff is a public official or public figure, the plaintiff must show the defendant acted with actual malice. *Id.* In defamation suits involving public figures, the actual malice standard serves to protect innocent but erroneous speech on public issues, while deterring "calculated falsehoods." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex. 2000).

were published, defamatory, and false. At the charge conference, Davila's attorney did not object to the submission of these questions.[6] Therefore, we conclude the trial court did not grant a directed verdict on Davila's slander per se claims. Accordingly, we review the sufficiency of the evidence in support of the jury's findings as those questions were presented to the jury in the charge.

## WAS OLIVA'S STATEMENT THAT DAVILA "STOLE" HIS PROPERTY FALSE?

In question three, the jury was asked whether Oliva "publish[ed] the following: Mr. Davila, on July 5, 2008, stole property belonging to me located at 2017 Maryland, Laredo, Texas [the address of the empty house]." The jury was asked whether the statement that Davila "stole property belonging to" Oliva "was false at the time it was made as it related to" Davila. The jury charge defined "false" to mean "a statement [that] is not literally true or not substantially true. A statement is not 'substantially true' if, in the mind of the average person, the gist of the statement is more damaging to the person affected by it than a literally true statement would have been." On appeal, Oliva asserts the evidence is legally and factually insufficient to support this finding because the only "statement" he made was his inventory report, which did not contain an allegation that Davila was the person who stole the property. According to Oliva, his identification of Davila as one of the suspects is not sufficient to show he said Davila "stole" the property.

Because Oliva is attacking the legal sufficiency of the evidence supporting an adverse finding on an issue for which he did not have the burden of proof, Oliva must show that no evidence supports the jury's adverse finding. *See Croucher v. Croucher*, 660 S.W.2d 55, 58

---

[6] The only objections raised at the charge conference by Davila's attorney were to the submission of questions regarding the issues of private plaintiff versus a nonmedia defendant involving private issues. These objections were sustained.

(Tex. 1983).  Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review."  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).  We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not."  *Id.*  When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, amounts to no evidence.  *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010).

An essential element of defamation is that the alleged defamatory statement be a statement of fact rather than opinion.  *Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex. App.—Dallas 1991, writ denied).  The statement need not be true in every detail; substantial truth is sufficient to establish the defense.  *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990).  Under the "substantial truth" test, the statement is examined in its entirety to determine whether the "gist" of the statement is substantially true.  *Id.* at 16.  Also, "we must bear in mind the established rule that an expression of opinion is protected free speech."  *Simmons v. Ware*, 920 S.W.2d 438, 446 (Tex. App.—Amarillo 1996, no writ).  Thus, we next determine whether the statement in question was merely an expression of opinion or was an actionable assertion of fact by Oliva. That is a question of law to be determined by the court.  *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989).

Nothing in the record supports a finding that Oliva's statements in the police report or to Reyes were anything more than his opinion about the circumstances surrounding his missing property.  In fact, the evidence overwhelmingly supports the conclusion that Oliva honestly believed Davila was a suspect.  The police "case report" states the "reporting party [Oliva] stated to police that an unknown subject(s) committed the said offenses at 2017 Maryland."  Oliva later

spoke with a Laredo Police Department investigator (Reyes), who instructed Oliva to prepare an inventory of the missing items. Oliva gave Reyes an inventory captioned "CONFIDENTIAL PERSONAL SENSITIVE INFORMATION – DO NOT DISCLOSE TO PUBLIC." As part of the inventory, Oliva provided background information, a description of the missing items, and the names of witnesses. Oliva also identified as potential suspects the seven people, including Davila, who had access to the house. As part of his investigation, Reyes confirmed Lozano, one of Davila's sisters, a worker hired by Davila, and one of Davila's brothers had been asked by Davila to remove property from the house. It is undisputed that Oliva's key to the house did not work, and Davila admitted he was the only person who had a key. Although Davila admitted he asked people to remove items from the house, he insisted he asked only that his own personal property be removed. However, some of the property removed at Davila's direction matched the description of the property Oliva listed as missing.

We examine the statement in its entirety because statements may be made defamatory by taking them out of context, and although they are abusive, unpleasant and objectionable to the plaintiff, they may not be "defamatory" in an actionable sense. *See Simmons*, 920 S.W.2d at 444-45. When construed as a whole in light of surrounding circumstances—the house was ransacked and property was missing, the statement was made to a police investigator, Davila or his family members held the only working key to the house, and Davila admitted instructing family members or workers hired by him to remove property from the house, coupled with Reyes's testimony that Oliva considered Davila a suspect—we conclude, as a matter of law, that the statement is not "defamatory" in an actionable sense because it is an opinion or characterization of Oliva's suspicions based on who had access to the house.[7]

---

[7] The jury awarded Davila $100,000 for past mental anguish and $100,000 for future mental anguish based on Oliva's alleged statement that Davila "stole" property. The jury also awarded exemplary damages. Because we

## WAS THE STATEMENT THAT DAVILA HAD AN AFFAIR AND SEXUAL RELATIONSHIP WITH ROSINA'S MOTHER "FALSE"?

In question two, the jury was asked whether Oliva "publish[ed] the following: Mr. Davila had an affair and sexual relationship with Josefina Rodriguez (Rosina's mother and Mr. Davila's sister-in-law)." The jury answered "yes." In question eight, the jury was asked whether this statement was false, and the jury answered "yes." On appeal, Oliva asserts the evidence is legally and factually insufficient to support these findings. It is true that DNA tests showed Davila was not Rosina's father. And, Davila denied he was Rosina's father. However, Davila was not asked and he did not deny having an "affair" and/or "sexual relationship" with Josefina. Because Davila denied only being Rosina's father—and no evidence was adduced denying an affair or sexual relationship—we conclude the evidence was legally insufficient to support the jury's finding that this statement was false.[8]

## DAMAGE TO DAVILA'S REPUTATION FROM OLIVA'S STATEMENT THAT DAVILA WAS ROSINA'S FATHER

The jury awarded damages for past injury to reputation in the amount of $25,000 caused by Oliva's statement that Davila is Rosina's father. On appeal, Oliva does not challenge the sufficiency of the evidence that he "published" the statement, that it was "defamatory," or that it was "false." In fact, he admitted to making the statement. Instead, he challenges the legal and factual sufficiency of the evidence in support of the damage award. For the purpose of our analysis, we will assume the statement was defamatory per se because it imputes sexual

---

conclude the evidence was insufficient to support the jury's findings on Oliva's liability, we need not consider whether the evidence was sufficient to support the damage awards.

[8] The jury awarded damages for future injury to reputation in the amount of $25,000 caused by Oliva's alleged statement that Davila had an affair and sexual relationship with Josephina. Because we conclude the evidence was insufficient to support the jury's findings on Oliva's liability, we need not consider whether the evidence was sufficient to support the damage award.

misconduct and, therefore, we begin with the presumption of injury and that Davila was entitled to recover actual damages for his injury.

In defamation per se cases, general damages are presumed to flow from the nature of the defamation itself; thus, such an action can be sustained even without specific proof of the existence and amount of harm. *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501 (Tex. App.— Houston [14th Dist.] 2008, pet. denied). However, even in defamation per se cases, appellate review of amounts awarded for non-economic damages is still required "to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant." *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). In *Bentley*¸ the Texas Supreme Court considered, among other issues, whether the evidence supported any award of actual damages to the plaintiff, and alternatively, whether the amount of actual damages was supported by the evidence.

The Court first noted that Texas law presumes that statements which are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish. *Id.* at 604. After reviewing the evidence, the Court concluded "the jury could readily have found that [the plaintiff's] reputation was in fact injured and that he in fact suffered mental anguish on account of the defendants' conduct." *Id.* The issue then became whether the amount of damages awarded was supported by the record.

In *Bentley*, the jury found that the defendants caused the plaintiff $150,000 in damages to his character and reputation. On appeal, the Supreme Court acknowledged that "[n]on-economic damages like these cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment." *Id.* at 605. However, the Court also stated that "the necessity that a jury have some latitude in awarding such damages does not, of course,

give it carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials." *Id.*

The Court held that "under our common law the latitude necessarily accorded a jury in assessing non-economic damages does not insulate its verdict from appellate review for evidentiary support." *Id.* at 605–06. "Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of [injury to reputation] damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive." *Id.* at 606. "The jury is bound by the evidence in awarding damages, just as it is bound by the law." *Id.*

Accordingly, the Court held that appellate courts are "authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable." *Id.* In other words, there must be some evidence to justify the amount awarded. *Id.* The Court stated that while the impossibility of any exact evaluation of injury to reputation requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Id.* "Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the standard language of the jury charge, 'would fairly and reasonably compensate' for the loss." *Id.* "There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding." *Id.*

Although the plaintiff in *Bentley* acknowledged he had not incurred any monetary loss as a result of the defendants' conduct, he offered evidence regarding the injury to his reputation and the mental stress he had suffered. He testified the defendants

> have taken time from me. They have ruined moments with my family, with my
> friends. They have—they have put a cloud over my home, my four children. And

> Jackie Gates, yes, sir, Mr. Gates—perhaps even more than Mr. Bunton—they have—I have—I have agonized because my name means something to me.... In a lot of ways, it's all I've got, and I've—the day I became judge, I appreciated that I had a position of trust, and that of all people I needed to maintain my integrity and try to be a virtuous man. I've got four children that I don't want [sic] embarrassed, and every time Mr. Gates or the rest of them opened their mouth, I know how it hurt them, how it hurt my sister, how it hurt my family.

*Id.* at 576. The plaintiff testified the accusation against him had been "the worst thing that's happened to me in my life," going "to the very heart of what my whole life is about." *Id.* Everywhere he went, he said, people would say that they had heard him called corrupt, although "most of them are well-meaning and a lot of them said it was joking." *Id.* He said he spent time worrying at home about the accusations, and that he worried about the effect on his family and the treatment of his children by their peers at school. *Id.* After reviewing the evidence before it, the Court determined the actual damages found by the jury for injury to the plaintiff's reputation was "well within a range that the evidence supports." *Id.* at 607. However, the Court remanded the cause to the Tyler Court of Appeals to reconsider the excessiveness of the jury's award of $7 million for mental anguish damages.

As to the award of mental anguish damages, the Tyler Court of Appeals noted the record showed, primarily, that the plaintiff's home life, rather than his professional life, was injuriously affected:

> The evidence shows some mental suffering. Although Bentley [the plaintiff] sulked and worried, was upset because his children were embarrassed, and was even sad and depressed, his mental suffering never rose to a level requiring the attention of a professional to help him cope with it. There is no evidence that Bentley suffered an economic loss tied to his mental anguish. We acknowledge that Bunton's actions created a very unpleasant time for Bentley and his family. However, the jury did not accurately assess Bentley's actual damages in this case. An award of $7,000,000.00 in mental anguish damages is unsupported by the evidence and is so large as to be contrary to reason.

*Bunton v. Bentley*, 176 S.W.3d 18, 20–21 (Tex. App.—Tyler 2003), *aff'd in part, rev'd on other grounds and remanded in part*, 153 S.W.3d 50 (Tex. 2004). The Tyler court, therefore, sustained the defendant's issue to the extent he complained about the excessiveness of mental anguish damages and suggested a remittitur in lieu of a new trial.

Although the *Bentley* case involved a public plaintiff, the analysis is the same involving, as here, a private plaintiff suing a nonmedia defendant: even in defamation per se cases we must still examine the record to determine whether the amount of damages awarded fairly and reasonably compensates the plaintiff for his injury. Here, no one, not even Davila himself, testified about Davila's reputation or any damage to his reputation as a result of Oliva's statement that Davila was Rosina's father.[9] Thus, there was no evidence that would enable reasonable and fair-minded people to find Davila sustained general damage to his reputation as a result of Oliva's statement, much less evidence supporting a specific fair and reasonable amount. Accordingly, we conclude the evidence is legally insufficient to support any award of damages for past injury to reputation.[10]

### ALTERNATIVE RELIEF

In the judgment, the trial court ordered that "in the alternative, in the event the foregoing judgment is reversed on appeal, [Davila may] recover damages from [Oliva] in the sum of" $250,000, plus interest and court costs, "for intentional infliction of emotional distress because no alternative cause of action will provide a remedy for [Davila] for the severe emotional distress caused by" Oliva.

---

[9] The only evidence concerning Davila's injury from any of the three statements made by Oliva came from Lozano's testimony about the injury Davila allegedly suffered as a result of Oliva's statement that Davila stole from him. Neither Lozano, nor anyone else, testified about Davila's reputation.

[10] The Texas Pattern Jury Charges suggest that the following instruction be given where a statement is defamatory per se: "You must award at least nominal damages for injury to reputation in the past." State Bar of Tex., *Texas Pattern Jury Charges—Defamation General Damages* PJC 115.33 (2008). In this case, this instruction was not given to the jury. Therefore, we conclude a remittitur for nominal damages is not appropriate.

Intentional infliction of emotional distress is a "gap-filler" tort, created to permit recovery in "those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffmann–La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). This tort's "clear purpose" is "to supplement existing forms of recovery by providing a cause of action for egregious conduct" that might otherwise go unremedied. *Id.* (quoting *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)). However, the tort "should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Id.*

As a "gap-filler" tort, intentional infliction of emotional distress was never intended as an easier and broader way to allege claims already addressed by our civil and criminal laws, nor was it intended to replace or duplicate existing statutory or common law remedies. *See id.*; *Draker v. Schreiber*, 271 S.W.3d 318, 322 (Tex. App.—San Antonio 2008, no pet.). "Thus, if the gravamen of a plaintiff's complaint is another tort, a claim for intentional infliction of emotional distress claim will not lie regardless of whether the plaintiff succeeds on, or even makes the alternate claim." *Draker*, 271 S.W.3d at 322.

Under his intentional infliction of emotional distress claim, Davila pointed to two statements allegedly made by Oliva as the source of his "severe emotional distress." Clearly the gravamen of Davila's complaint is another tort—slander—which is a "recognized theory of redress." Thus, Davila's intentional infliction of emotional distress claim "will not lie regardless of whether" he succeeds on the slander claim. *Id.* Accordingly, the trial court erred in rendering an alternative judgment in Davila's favor.

## CONCLUSION

For the reasons stated above, we reverse the trial court's judgment and render a take-nothing judgment in favor of Oliva.[11]

Sandee Bryan Marion, Justice

---

[11] Because they are not dispositive to this appeal, we do not address Oliva's remaining issues. TEX. R. APP. P. 47.1.